In re DURA PHARMACEUTICALS, INC. SECURITIES LITIGATION,

This Document Relates to: All Actions

No. 99CV0151–L(NLS).

United States District Court, S.D. California.

June 2, 2006.

William F. Sullivan, Paul Hastings Janofsky and Walker, San Diego, CA, for Dura Pharmaceuticals, Inc. Securities Litigation.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS THIRD CONSOLIDATED AMENDED COMPLAINT

LORENZ, District Judge.

This matter came on regularly for a hearing on Defendants' motion to dismiss

the Third Consolidated Amended Complaint ("TAC"). Patrick J. Coughlin and Tor Gronborg of Lerach Coughlin Stoia Geller Rudman & Robbins LLP appeared for the Plaintiffs. William F. Sullivan of Paul Hastings Janofsky & Walker appeared for the Defendants.

Having carefully reviewed the parties' briefs, oral argument, and applicable law, the Court finds the TAC's allegations regarding Albuterol Spiros fail to meet the pleading requirements under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u–4(b)(1) and (2), and that the TAC's allegations regarding Defendants' statements about Ceclor CD properly state a claim under the PSLRA against certain Defendants. The Court therefore **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss.

### BACKGROUND

Plaintiffs bring this action on behalf of purchasers of shares of Dura Pharmaceuticals, Inc. ("Dura" or the "Company") securities from April 15, 1997 to February 24, 1998 ("Class Period") including those purchasers who acquired their Dura securities during the Class Period and held such securities until after September 23, 1998, November 4, 1998, and December 4, 1998. (TAC ¶ 1.) Dura was a San Diego-based developer and marketer of prescription pharmaceutical products for the treatment of allergies, asthma and related respiratory conditions. *Id.* ¶ 61. The Individual Defendants held the following positions at Dura during the Class Period: Cam L. Garner ("Garner") was President, Chief Executive Officer, Chief Operations Officer, and Chairman; James W. Newman ("Newman") was Senior Vice President–Finance & Administration and Chief Financial Officer; Charles W. Prettyman ("Prettyman") was Senior Vice President–

Development and Regulatory Affairs; Walter F. Spath ("Spath") was Senior Vice President–Sales & Marketing; Mitchell R. Woodbury ("Woodbury") was Senior Vice President/General Counsel; Julia R. Brown ("Brown") was Senior Vice President–Business Development and Planning; and Joseph C. Cook ("Cook") was a director. *Id.* ¶ 62.

Dura became a publicly-traded company in 1992, pursuing a business strategy of marketing niche pharmaceutical drugs. *Id.* ¶ 1. At that time, Dura typically purchased the rights to market drugs developed by large pharmaceutical companies that were approaching the end of their profitability to those companies. *Id.* By 1995, Dura's management realized that given the Company's size, it would be increasingly difficult to achieve continued revenue and earnings per share ("EPS") growth solely by acquiring marketing rights to niche drugs. *Id.* ¶ 2. Therefore, Dura insiders decided to diversify the Company's business, and become a medical device development company and develop its own proprietary drug products. *Id.* In 1995, Dura began developing the Spiros drug delivery system for Albuterol ("Albuterol Spiros" or "Spiros drug delivery system"), a method of aerosolizing powders so that asthma medicines, including Albuterol, could be inhaled. *Id.* ¶ 3. This system purportedly would have advantages over existing inhalers that depended on the user to successfully coordinate the use of the inhaler and inhalation of the medication. *Id.* The Spiros drug delivery system was a software-driven device with software programmed to turn on a motor that activated an impeller inside the device, which in turn extracted the Albuterol drug compound from the storage cassette that fit inside the inhaler. *Id.* ¶ 4. Dura's insiders created Spiros Development Corporation ("Spiros I") to incur Dura's costs of developing the Spiros drug delivery sys-

tem. *Id.* ¶ 5. Plaintiffs contend development of the inhaler was plagued with significant electro-mechanical problems that plagued Spiros' reliability, and stability problems with Albuterol.

In August 1996, Dura acquired from Eli Lilly the marketing rights for Ceclor CD, a prescription antibiotic. *Id.* ¶¶ 29–30, 67. Ceclor CD is a slow-release form of Ceclor, a second generation cephalosporin generically known as cefaclor. *Id.* ¶ 30. Its use decreased in the late 1990s as more powerful antibiotics with fewer significant side effects were developed. *Id.*

Prior to the Class Period, after reaching a then all-time high price of $47.87 on December 31, 1996, Dura stock fell sharply to $27.87 on April 14, 1997. *Id.* ¶¶ 7, 168. This decline created problems for Dura's executives. *Id.* By early 1997, as Dura was conducting Phase III clinical trials on Albuterol Spiros, Defendants were completing a major debt offering for Dura to obtain working capital to acquire additional pharmaceutical products. *Id.* ¶ 19. The Defendants also knew that Spiros I would exhaust its financial resources during 1997, and Dura would have to exercise its option to repurchase Spiros I and finance a new follow-on Spiros Development Corp. II entity to continue to pay for the ongoing development of Albuterol Spiros. *Id.* ¶¶ 6, 19, 168. In addition, the value of Dura's insiders' existing stock options to purchase thousands of shares of Dura stock had been completely wiped out in early 1997 when Dura's stock price dropped, and the cash bonuses for Dura's top executives were dependent upon Dura meeting internally set 1997 EPS targets and Dura's stock price performance during 1997. *Id.* ¶¶ 20, 168, 172. For these reasons, it was imperative to Dura's insiders that they drive Dura's stock higher during 1997. *Id.* ¶ 21, 168.

According to Plaintiffs, in their effort to raise Dura's stock price, beginning in April 1997 and continuing through the Class Period, Defendants began a "concerted campaign to falsely persuade investors that Dura's sales were increasing and that Dura was successfully completing the development and clinical trials of the Spiros drug delivery system." *Id.* ¶¶ 22, 169. Plaintiffs state Defendants concealed problems with the development of Albuterol Spiros and falsely represented sales of Ceclor CD were strong. *Id.* ¶¶ 23–24, 29. Plaintiffs allege that during the Class Period, the Individual Defendants engaged in suspicious insider trading, selling 188,626 shares for over $7.3 million between May 12, 1997 and July 22, 1997, and selling over 190,000 shares between November 3, 1997 and January 6, 1998 for $9.2 million in proceeds. *Id.* ¶¶ 27–28, 44, 147, 171, 175–82.

On the last day of the Class Period, February 24, 1998, Dura revealed that it expected lower-than-forecast 1998 revenues and 1998 EPS due to slower-than-expected sales of the Ceclor CD and Nasarel/Nasalide product lines, and the need to increase the size of its sales force from 270 to over 450 to try to boost sales of existing products. *Id.* ¶¶ 45, 159. Dura's stock thereafter dropped from $39.13 on February 24, 1998, to $20.75 on February 25, 1998, an $18.38 per share, 47% one-day decline on a volume of 32 million shares. *Id.* One analyst's reaction to Dura's announcement was that:

> Our confidence in management and their credibility with us has been greatly diminished. As recently as one month ago, we reviewed our model with the Company line by line and were guided to higher Ceclor CD estimates. In our opinion, not too much could have changed between now and then, and we believe that this revenue shortfall is not

new news to Dura, but frankly, comes as a surprise to us.

*Id.*

Dura's business performed poorly during the balance of 1998. *Id.* ¶¶ 49, 160. Sales of Ceclor CD fell to only $30 million. *Id.* ¶ 49. In an April 16, 1998 conference call with analysts, Dura admitted that, at least by December 1997, the wholesale channels had been clogged with many months of excess Ceclor CD inventory. *Id.* ¶¶ 49, 160.

After the Class Period ended, in April 1998, Dura placed an advertisement in *Advance for Managers of Respiratory Care* regarding Albuterol Spiros. *Id.* ¶ 161. On April 30, 1998, the FDA sent Dura a letter of rebuke stating that: "the journal ad is in violation of the Federal Food, Drug, and Cosmetic Act (the "Act") and its implementing regulations, because it promotes an unapproved drug by making claims of safety and efficiency that have not been demonstrated by substantial evidence (*i.e.* adequate and well-controlled studies)." *Id.* ¶ 162.

In September 23, 1998, Dura disclosed that it had submitted additional chemistry and manufacturing control information requested by the FDA in support of the original New Drug Application ("NDA"), thus finally revealing the long-known problems with the device. *Id.* ¶¶ 46, 163. Dura also conceded that the Albuterol Spiros launch date had slipped to second quarter 1999. *Id.* In response to this announcement, Dura's stock price declined 28% from $15.25 on September 23, 1998 to $10.00 on September 25, 1998. *Id.*

On November 4, 1998, Dura was forced to report that the FDA had rejected the Albuterol Spiros NDA because the Spiros device was not reliable due to its unaccept-

ably high failure rate and because Dura had provided insufficient data to demonstrate Albuterol's stability. *Id.* ¶¶ 47, 164. Defendants stated in a press release that the FDA "raised no issues on the clinical data with the inhaler filed in the NDA demonstrating therapeutic comparability of Albuterol Spiros ™ with Ventolin® (albuterol) MDI using standard lung function measures." *Id.* In response to this disclosure, the Company's stock price declined 21% from $12.50 to $9.34 on November 3, 1998. *Id.*

On November 6, 1998, the FDA issued a "Notice of Violation" to Dura, stating that Dura's press release sent a message that "misleadingly minimizes the fact that Dura must conduct a completely new clinical data [study]." *Id.* ¶¶ 48, 165. Dura removed the press release from the website, but did not publicly disclose the November 6, 1998 letter of rebuke until December 4, 1998. *Id.* When the FDA's letter was finally disclosed, Dura's stock price declined an additional 13% from $12.56 to $10.50. *Id.* Ultimately, Dura completely abandoned the development of the Spiros device for use with Albuterol because Dura could not overcome the reliability and stability problems. *Id.* ¶¶ 50, 165.

Plaintiffs filed several class actions alleging violations of §§ 10(b) and 20(a) of the Securities and Exchange Act and Rule 10b–5 promulgated by the Securities and Exchange Commission. The cases were consolidated into the instant case number. By order dated July 12, 2000, this Court granted Defendants' motion to dismiss the Consolidated and Amended Complaint, and dismissed the pleading without prejudice. Plaintiffs subsequently filed a Second Consolidated Amended Complaint. This Court dismissed the Second Consolidated Amended Complaint. In relevant part[1],

---

**1.** The Second Consolidated Amended Complaint alleges Defendants misrepresented the

this Court held that Plaintiffs had not adequately alleged loss causation as to the misrepresentations regarding Albuterol Spiros.

This Court further found that Plaintiffs' allegations regarding Ceclor CD sales were insufficient because "[t]he mere fact that intraquarterly results lagged behind internal projections does not, without more, require disclosure." *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir.1996). The Court also held the Complaint's allegations regarding Ceclor CD were conclusory because although Plaintiffs alleged the Company was shipping amounts of the product "well in excess of the amount justified by or necessary to keep pace with current prescription levels and thus Dura had created vastly excessive amount of inventory of Ceclor CD in the distribution channel," the Second Consolidated Amended Complaint did not provide any factual support on how Defendants knew at the time the distribution channels were clogged. Rather, Plaintiffs alleged that after the Class Period ended, Dura admitted there was excessive inventory of Ceclor CD. This Court also held the Second Consolidated Amended Complaint's allegations regarding scienter were deficient, analyzing each basis for scienter individually.

On appeal, the Ninth Circuit reversed. The appellate court held that Plaintiffs had in fact adequately pled loss causation because it was sufficient that they allege the stock price was inflated at the time of purchase because of Defendants' fraud. *Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 938–39 (9th Cir.2003). The Ninth Circuit agreed with this Court and found deficient Plaintiffs' allegations of scienter based on: (1) the existence of reports

showing Ceclor CD sales were below internal projection; (2) stock sales; and (3) channel stuffing. However, after this Court dismissed the Second Consolidated Amended Complaint, the Ninth Circuit held that courts must also look at scienter allegations collectively. *No. 84 Employer–Teamster Jt. Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir.2003). The Ninth Circuit thus vacated this Court's finding of no scienter and instructed this Court to perform the final step of considering Plaintiffs' allegations collectively when conducting its scienter analysis. *Broudo*, 339 F.3d at 940. Finally, the Ninth Circuit held this Court should have allowed Plaintiffs to amend the complaint to include, *inter alia*, statements by a confidential witness who has direct knowledge that at least two of the Defendants discussed how they could make stock analysts "perceive" that Dura was doing better than it actually was and that one of the Defendant's oft-stated catch phrase to employees who questioned his tactics was "let 'em catch us." *Id.* at 941. The Ninth Circuit held that "[s]uch allegations are the type that could demonstrate a strong inference that Dura knowingly or with deliberate recklessness made false or misleading statements to investors." *Id.*

The United States Supreme Court agreed to hear the loss causation issue. Last year, the Supreme Court reversed the Ninth Circuit and held that an inflated purchase price by itself does not constitute or proximately cause the relevant economic loss needed to allege and prove "loss causation." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345–46, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). The Court held that a securities fraud plaintiff must allege and prove that a defendant's misrepresen-

effectiveness of its sales force, the sales and success of its product Rondec, and the sales

of Nasalide. The TAC does not rely on those alleged misrepresentations.

tation or other fraudulent conduct proximately caused the plaintiff's economic loss, and thus must provide defendants with notice of what the relevant economic loss might be and the causal connection between the loss and the misrepresentation. *Id.* at 346, 125 S.Ct. 1627. The Court further held that Plaintiffs' Complaint did not adequately plead loss causation. *Id.* at 346–47, 125 S.Ct. 1627.

The Ninth Circuit subsequently remanded the case to this Court for further proceedings, and directed that Plaintiffs be given an opportunity to amend their complaint, *inter alia*, in a manner that complies with the Supreme Court's requirements for loss causation.

## APPLICABLE LAW REGARDING MOTIONS TO DISMISS SECURITIES CLASS ACTIONS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.2001). Dismissal of a claim under this rule is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Navarro*, 250 F.3d at 732. In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir.1987); *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981).

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to use in connection with the mails or facilities of interstate commerce any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b–5, promulgated under section 10(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The elements of a Rule 10b–5 claim are: (1) a misrepresentation or omission of a material fact; (2) scienter; (3) causation; (4) reliance; and (5) damages. *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1335, 164 L.Ed.2d 51 (2006).

Claims brought under Rule 10b–5 and § 10(b) must meet Federal Rule of Civil Procedure 9(b)'s particularity requirement that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b); *see Daou*, 411 F.3d at 1014; *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir.1999). In addition, in 1995, Congress enacted the

PSLRA and altered the pleading requirements in private securities fraud litigation by requiring a complaint " 'plead with particularity both falsity and scienter.' " *Daou,* 411 F.3d at 1014 (quoting *Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir. 2002)).

When the plaintiff alleges the defendant either (1) made an untrue statement of material fact or (2) omitted to state a material fact necessary to make statements made not misleading, the PSLRA requires the complaint to " 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' " *Daou,* 411 F.3d at 1014 (quoting *Gompper,* 298 F.3d at 895). Second, regarding scienter, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *Daou,* 411 F.3d at 1014. Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

The Ninth Circuit "incorporate[s] the dual pleading requirements of §§ 78u–4(b)(1) and (b)(2) into a single inquiry, because falsity and scienter are generally inferred from the same set of facts." *In re Read–Rite Corp. Sec. Litig.,* 335 F.3d 843, 846 (9th Cir.2003); *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001). Thus, when evaluating whether a private securities fraud complaint survives a motion to dismiss, the court "must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] deliberate recklessness made false or misleading statements to investors." *Ronconi,* 253 F.3d at 429 (internal quotations omitted); · *accord Read–Rite,* 335 F.3d at 846. "The requirement to plead all the facts with particularity means that a plaintiff must provide a list of all relevant circumstances in great detail." *Read–Rite,* 335 F.3d at 846 (internal quotations omitted); *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 984 (9th Cir.1999). "To meet this pleading requirement, the complaint must contain allegations of specific contemporaneous 'statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi,* 253 F.3d at 432; *accord Read–Rite,* 335 F.3d at 846. In determining whether plaintiffs have adequately pled scienter, courts must consider " 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.' " *Am. W.,* 320 F.3d at 938 (quoting *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1038 (9th Cir.2002)). When conducting this analysis, the court must consider all reasonable inferences, whether or not favorable to the plaintiffs. *Daou,* 411 F.3d at 1022. "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)." *Ronconi,* 253 F.3d at 429; *accord Read–Rite,* 335 F.3d at 846.

## SUFFICIENCY OF THE ALLEGATIONS OF VIOLATIONS OF § 10(B) AND RULE 10B–5

Plaintiffs contend Defendants misrepresented the Company's sales and business

performance throughout the Class Period and thereby inflated Dura's stock price. In particular, Plaintiffs maintain Defendants made material misrepresentations and omissions regarding the development of its Albuterol Spiros product and the sales of Ceclor CD.

## I. *Albuterol Spiros*

### A. Allegations Regarding Albuterol Spiros

Plaintiffs allege that, as reported by analysts, Dura's Albuterol Spiros was an important development for the company. (TAC ¶¶ 97, 125.) According to Plaintiffs, Dura made numerous misrepresentations regarding Dura's Albuterol Spiros drug delivery technology. Specifically, Plaintiffs contend Dura's 1996 Annual Report, which was issued on April 15, 1997, stated the device was a durable system, and touted the benefits of this product. (TAC ¶ 74.) A press release issued that day reported better-than-expected 1Q 1997 results and stated the Company was continuing to develop its Albuterol Spiros product. *Id.* ¶ 75. As a result of these announcements, Dura's stock rose over 21% from $27.87 on April 14, 1997 to $34 on April 15, 1997. *Id.* ¶ 76.

On April 15, 1997, Oppenheimer & Company, Inc. ("Oppenheimer"), Alex. Brown, Robertson Stephens & Co. ("Robertson Stephens"), and William Blair & Co. ("William Blair") issued reports on Dura and the development of Spiros. *Id.* ¶ 95. These reports were based on and repeated information provided in: (1) an April 15, 1997 conference call with securities analysts in conjunction with the 1996 Annual Report and press release; and (2) in follow-up conversations with Garner or Newman. *Id.* These reports stated that Spiros' development was on track and Dura would soon be completing clinical trials. *Id.* Shortly thereafter on April 25, 1997, Op-

penheimer issued a report on Dura based on and repeating information concerning Dura's Spiros development provided in conversations with Garner and Newman that stated Albuterol Spiros would be submitted to the FDA before the end of the year. *Id.* ¶ 96. On April 28, 1997, UBS Securities ("UBS") issued a report on Dura that was based on and repeated information provided in conversations with Dura executives, including Garner or Newman, that stated Spiros was allowing Dura to differentiate itself from a typical marketing company and the Company would become more "fully integrated" through the development of the Spiros inhaler. *Id.* ¶ 97. The report also stated that the Company would file an NDA with the FDA in the second half of 1997 and expected it to be approved in the second half of 1998, with Spiros revenues adding about $58 million to Dura's current sales base in 1999. *Id.* Between May 7 to May 9, and on May 30, 1997, Vector Securities International ("Vector"), UBS, and William Blair issued similar reports stating that Dura was still on track to submit its first Spiros NDA filing in the second half of 1997. *Id.* ¶¶ 98–99. On May 30, 1997, Alex. Brown and Vector also reported that Dura would file its NDA for Albuterol Spiros in the second half of 1997 that could add $100 million in revenues by 2000. *Id.* ¶ 99.

Plaintiffs maintain Dura's June 5, 1997 press release announcing the completion of clinical trials necessary for an NDA submission for Albuterol Spiros was false and misleading. *Id.* ¶¶ 100–01. In that release, David S. Kabakoff, Dura's Executive Vice President and President and CEO of Spiros Corp. stated Dura was pleased with the results to date and was preparing the NDA for filing in the latter half of 1997. *Id.* ¶ 100. On June 30, 1997, William Blair reported that Newman had stated at an investment conference that Dura planned

to file the Albuterol Spiros NDA by fall of 1997 and that the Company was continuing to develop the Spiros product line aggressively. *Id.* ¶ 103.

On July 15, 1997, Dura reported better-than-expected Q2 1997 results in a press release, and reiterated that the Company was on track to file the Albuterol Spiros NDA in the second half of 1997. *Id.* ¶ 106. Also on that date, five analysts issued reports on Dura that were based on and repeated information provided in a conference call and in follow-up conversations with Garner and Newman. *Id.* ¶ 115. The analysts reported Dura was on track to file the Albuterol Spiros NDA in the second half of 1997, that Albuterol Spiros could be on the market in late 1998 with initial sales of $10 million growing to over $55 million by 2000, and that Albuterol Spiros would contribute significantly to Dura's long-term revenue and earnings growth. *Id.*

On July 25, 1997, Dura sold $287.5 million in convertible notes. *Id.* ¶ 123. In August 1997, analysts issued reports on Dura that were based on and repeated information from Garner and Newman stating that Spiros possessed significant advantages over alternative inhalers currently marketed or in development, and the launch of Albuterol Spiros in the second half of 1998 would be a watershed event for the Company. *Id.* ¶¶ 124–25. Analysts issued similar positive reports in September 1997 based on discussions with Garner and Newman. *Id.* ¶ 126. On October 8, 1997, Dura reported at the UBS Life Science Conference that the NDA filing for Albuterol Spiros was expected within days. *Id.* ¶ 127. On that day, UBS issued a report that reiterated this information. *Id.* ¶ 128.

On these announcements, Dura's stock rose 7.7% to $52.25—its then all-time high price. *Id.* ¶ 129. On October 10, 1997, Dura announced it was going to exercise

its option to buy Spiros for $45.7 million and then take Spiros public. *Id.* The public sale included one common share of a new company, Spiros II, as well as a warrant to buy one-fourth of a share of Dura common stock. *Id.* The initial public offering was expected to raise between $75 million and $86.25 million. *Id.* Dura said it would contribute some technology and technology rights, as well as $75 million cash to Spiros II prior to the IPO. *Id.*

In mid-October, Dura reported better-than-expected Q3 1997 results. *Id.* ¶ 131. Plaintiffs contend that in a conference call and follow-up conversations with analysts, Defendants reiterated that the NDA for Albuterol Spiros would be filed in November 1997, and continued to tout the significance of Albuterol Spiros on the Company's future revenues. *Id.* ¶¶ 132, 142. On November 10, 1997, Dura announced in a press release that it had submitted an NDA for Albuterol Spiros with the FDA. *Id.* ¶ 143. On December 17, 1997, Dura and Spiros II sold 5.5 million Spiros II units at $16 per unit, raising $88 million in needed new capital. *Id.* ¶ 144. Each unit sold consisted of one share of callable common stock of Spiros II and one warrant to purchase one-fourth of one share of Dura common stock. *Id.*

On January 20, 1998, Dura reported better-than-expected Q4 results via a press release. *Id.* ¶ 149. After Dura reported better-than-expected Q4 1997 results, analysts issued reports based on conversations with Garner or Newman that stated Dura expected the FDA to approve Albuterol Spiros by the end of 1998. *Id.* ¶¶ 156–57. The analysts further reported Dura expected to launch Albuterol Spiros by early 1999, and that the product would be a significant portion of the company's revenue. *Id.* ¶ 156.

Plaintiffs contend that contravening their public praise for the Spiros technolo-

gy, Defendants knew since the fall of 1996 that there were serious reliability problems with the Spiros device and stability problems with Albuterol. *Id.* ¶¶ 8, 9, 94. According to Plaintiffs, in October 1996, Robert Eisele, Vice President of Product Development, documented these problems in a list that was contained in a five to six page document setting forth necessary items to be addressed before an NDA could be properly submitted. *Id.* ¶¶ 9–10, 94, 121. Before Phase III clinical trials began, Dura devised in-house experiments to test the efficacy of Albuterol Spiros at certain temperatures and humidity levels. *Id.* ¶¶ 11, 91. This testing revealed unacceptable levels of reduced efficacy when Albuterol was exposed to humidity. *Id.* According to Plaintiffs, Dura's own engineers objected to pursuing Phase III clinical trials because of Albuterol Spiros's reliability and stability problems. *Id.* ¶¶ 9, 12. Dura was unable to fix the problems prior to commencing Phase III clinical trials, and thus started Phase III clinical trials with versions of Albuterol Spiros that had these defects and, in fact, changed the device during clinical trials. *Id.* ¶¶ 15, 90, 93, 117, 120. The configuration of the product Dura used to conduct clinical trials was unreliable and plagued by significant electro-mechanical problems; over 30% of the inhalers failed. *Id.* ¶¶ 13–14, 23, 90, 92, 117, 119.

According to Plaintiffs, Defendants knew, based on their prior experience with the FDA and the medical device industry, that the FDA would not approve an NDA for an unreliable product and unstable drug. *Id.* ¶¶ 92, 119. Industry standards dictated that an NDA not be filed unless the early return rate was 1% or less. *Id.* ¶¶ 13, 92, 119. As a result of the inhaler's reliability problems during Phase III clinical trials, Dura began making modifications to the inhalers actually being used in the ongoing clinical trials to improve relia-

bility. *Id.* ¶¶ 15, 90, 93 117, 120. Plaintiffs allege all modifications to the device were documented within the clinical trial results and that senior management, including Defendant Prettyman, as Senior Vice President of Regulatory Affairs, had to sign off on proposed modifications before they could be made. *Id.* ¶¶ 16, 93, 120. Dura knew this would invalidate the Phase III clinical trials. *Id.* ¶¶ 18, 90, 117.

Plaintiffs contend senior executives were so concerned about the inhaler's reliability problems that Dura retained an outside testing facility, Wyle Labs, to conduct highly accelerated life tests ("HALT") on the device while Phase III clinical trials were still ongoing. *Id.* ¶¶ 18, 146. HALT are extreme condition tests designed to identify potential operational failures. *Id.*

Plaintiffs allege Defendants Garner, Prettyman, Spath, Woodbury, and Brown were informed during an executive management meeting held every Monday from 8:00 to 10:00 a.m. of the problems encountered during the Phase III clinical trials and of Albuterol's stability problems. *Id.* ¶¶ 92, 119. Further, Defendants Garner and Prettyman attended weekly Research and Development meetings during which the Spiros device development team presented Phase III clinical trial results and stability test results, and informed Garner and Prettyman that over 30% of the inhalers failed during clinical trials. *Id.* ¶¶ 11, 92, 102, 119. Minutes were also generated from these meetings and circulated to senior management. *Id.* ¶¶ 11, 17, 92.

Plaintiffs aver that senior management at Dura "were kept constantly informed of the problems affecting the inhaler's reliability via product reports prepared by Mike Ligotke, the Senior Product Engineer for the Spiros device and Linda Gieschen, the Spiros Project Leader." *Id.* ¶ 17. These reports also contained infor-

mation regarding the different configurations of the inhaler, the different tests being performed, and the results of those tests. *Id.* The reports were prepared for and circulated in advance of and during weekly research and development meetings attended by senior management. *Id.*

Plaintiffs contend that in addition to concealing the problems with Albuterol Spiros's development, the Defendants concealed a pre-NDA filing meeting Dura conducted with the FDA in May 1997. *Id.* ¶¶ 24, 101, 122. By the time that meeting occurred, Dura had completed clinical trials, and had received 95% of the data from the trials concerning chemical instability, doser reliability and failure rates. *Id.* ¶ 24. At that meeting, which included Garner and Prettyman, the FDA raised concerns regarding the Spiros device's reliability and with Albuterol's stability. *Id.* ¶¶ 25, 101, 122.

Plaintiffs further contend there was internal dissension among Defendants whether to file the NDA for the Spiros device. *Id.* ¶¶ 12, 28, 145. In late October or early November 1997, a meeting was held to discuss the NDA filing. *Id.* Defendants Garner and Prettyman attended, and Prettyman made it clear that he did not want to file the NDA for which his department, Regulatory Affairs, was responsible, because he knew based on his prior experience that the NDA would not be approved by the FDA. *Id.* ¶¶ 28, 145. Despite this, he was overruled and Dura filed the NDA on November 10, 1997. *Id.*

### B. Adequacy of The TAC's Allegations

Defendants present several challenges to the TAC's allegations regarding Albuterol Spiros. Defendants contend Plaintiffs fail to state a claim because they do not adequately plead loss causation, and because the TAC does not plead falsity and scienter with particularity. Defendants further contend that most of the statements alleged to be misleading are mere "puffery" or protected by the PSLRA's safe harbor provision or the bespeaks caution doctrine. Defendants also contend they cannot be held liable for statements made by third-party analysts.

### 1. Loss Causation

One of the elements of a Rule 10b-5 cause of action that a Plaintiff must plead and prove is loss causation. 15 U.S.C. § 78u–4(b)(4); *Dura*, 544 U.S. at 341, 125 S.Ct. 1627. As noted above, this Court dismissed the Second Consolidated Amended Complaint's allegations regarding Albuterol Spiros on the basis the pleading did not adequately plead loss causation. The Ninth Circuit reversed on this issue, and the Supreme Court reversed the Ninth Circuit, holding that securities class action plaintiffs must allege that the misrepresentations proximately caused the plaintiffs' economic loss. The Supreme Court's decision did not create a heightened pleading standard for loss causation: the Court noted its holding did not affect Rule 8(a)(2)'s applicability. *Dura*, 544 U.S. at 346, 125 S.Ct. 1627. The Ninth Circuit remanded this case to this Court to allow Plaintiffs an opportunity to amend the complaint in conformity with the Supreme Court's decision. The TAC now alleges that Defendants' misrepresentations regarding Albuterol Spiros artificially inflated Dura's stock price, (TAC ¶¶ 74–76, 95–100, 103, 105–06, 115, 125–29, 132–33, 142–43, 156–57), Defendants made corrective disclosures regarding Albuterol Spiros' stability and functionality on September 23, 1998, November 4, 1998, and December 4, 1998, and the resulting stock

drop on those dates.[2] (TAC 159, 163–65, 183–98, 200.)

Defendants contend Plaintiffs are impermissibly trying to expand the Class Period through to December 4, 1998, but they are barred from doing so by the applicable statute of limitations. The statute of limitations for this type of claim is one year after the discovery of the facts constituting the violation and within three years after such violation. 15 U.S.C. § 78i(e). Defendants state Plaintiffs were on notice of the events and stock price declines that occurred on September 23, November 4, and December 4, 1998 when they filed their action, but they strategically elected to end the Class Period on February 24, 1998. Defendants state the statute of limitations has run regarding these newly added claims and they do not relate back to the original complaint as the Plaintiffs who allegedly held stock on these three dates do not have an identity of interest with the original Plaintiffs, whose claims and alleged damages were associated with the 47% price decline that occurred between February 24, 1998, and February 25, 1998.

The Court is not persuaded by Defendants' arguments. First, Defendants' statute of limitations argument is premised on the assumption that Plaintiffs have added claims or class members, or attempted to expand the Class Period. A review of the TAC, however, reveals that Plaintiffs are not attempting to expand the Class Period or add new class members. Rather, the TAC explains, in accordance with *Dura*, the causal relationship between Defendants' allegedly fraudulent statements and the decline in stock price. The earlier complaint focused on the drop in stock

price following Dura's February 24, 1998 announcement, and failed to explain how the misrepresentations regarding Albuterol Spiros touched upon the reasons for the decline in price. But in the TAC, Plaintiffs allege that those who purchased shares during the Class Period and held the stock on September 9, 1998, November 4, 1998, and December 4, 1998 suffered a loss when information was revealed on those dates showing the Defendants had misrepresented the development of Albuterol Spiros. Thus, they have explained how the misrepresentations regarding Albuterol Spiros proximately caused economic loss on those dates. Under the liberal pleading requirements of Rule 8(a), these allegations are sufficient to meet the loss causation requirement.

Defendants next argue that Plaintiffs have cited no authority that allows them to manipulate the class claims by linking Class Period purchasers with losses associated with various events and disclosures that occurred after the close of the Class Period. Defendants state Plaintiffs are essentially creating a "holder class" through December 4, 1998, which is impermissible. Defendants are correct that "holder classes" are not entitled to sue under Section 10(b). *Williams v. Sinclair*, 529 F.2d 1383, 1389 (9th Cir.1975). However, an improper "holder class" is comprised of individuals who "neither purchased nor sold shares in reliance upon the alleged misrepresentations or concealments." *Id.* In this case, the TAC alleges that Plaintiffs purchased Dura's shares in reliance on, *inter alia*, Defendants representations regarding the Company's devel-

---

**2.** The TAC also alleges that the February 24, 1998 announcement somehow caused losses associated with the misleading information about Albuterol Spiros' approvability. Defendants contend this allegation does not meet *Dura's* standard of proximate cause because

nowhere in the February 24, 1998 announcement is there any indication of Spiros' mechanical or reliability problems. Plaintiffs do not attempt to defend this allegation in their opposition to the motion to dismiss.

opment of Albuterol Spiros. Accordingly, none of the Plaintiffs constitute a "holder class."

Defendants next argue the securities laws contemplate that the losses for which plaintiffs seek recovery are those occurring during the class period, not months or years beyond its termination. In support, Defendants quote cases where district courts indicate a plaintiff's loss occurs during the class period. (Defs.' Mot. To Dismiss at 20, citing *In re Portal Software, Inc. Sec. Litig.*, No. C–03–5138–VRW, 2005 WL 1910923, at \*16 (N.D.Cal. Aug. 10, 2005), *In re Surebeam Corp. Sec. Litig.*, No. 03CV1721, 2003 U.S. Dist. LEXIS 25022, at \*23 (S.D.Cal. Jan. 5, 2004); *Aronson v. McKesson HBOC, Inc.*, 79 F.Supp.2d 1146, 1157–58 (N.D.Cal.1999), *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 81–82 (D.Md.1991)). *Kirschner* states a class period cannot extend beyond the date curative information was effectively disseminated to the market. *Kirschner*, 139 F.R.D. at 81–82. However, neither *Kirschner* nor any of the other cases the parties cite address whether a securities fraud claim is barred as a matter of law when the corrective disclosures occur several months after the class period ends.

There is some appeal to requiring a corrective disclosure to occur at the end of the class period. For instance, in this case, those who purchased Dura's stock after the Class Period ended and suffered losses when the truth about Albuterol Spiros was revealed are, as Plaintiffs' counsel stated in oral argument, "out of luck." Although those purchasers suffered losses as a result of Defendants' alleged misstatements and omissions regarding Albuterol Spiros, they will not receive any compensation as their interests are not represented in this lawsuit. A rule requiring the corrective disclosure to immediately follow the end of the Class Period would ensure such purchasers' interests are protected. Nevertheless, the Court finds the authority Defendants cite insufficient to impose such a requirement. When presented with this case, the Supreme Court could have held that as a matter of law Plaintiffs cannot establish loss causation because the corrective disclosures regarding Albuterol Spiros were made several months after the Class Period ended. The Supreme Court did not so hold, and instead only required the Plaintiffs to properly allege a causal connection between the economic losses suffered and the Defendants' misrepresentations. *Dura*, 544 U.S. at 346–47, 125 S.Ct. 1627.

Finally, Defendants argue that Plaintiffs' theory cannot be squared with other provisions of the PSLRA, such as the "look-back" provision codified at 15 U.S.C. § 78u–4(e)(1), which provides for an upward limitation on damages in a Section 10(b) securities case. As Plaintiffs point out, however, that statutory provision does not measure damages based on the end of the class period. Rather, the PSLRA requires damages be calculated from the date the truth is revealed: in other words, the damages are limited to "the mean trading price of that security during the 90–day trading period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. § 78u–4(e)(1).

In sum, the Court concludes the TAC adequately alleges loss causation regarding Defendants' alleged misstatements and omissions regarding Albuterol Spiros.

### 2. Falsity and Scienter

Defendants maintain the TAC does not adequately allege falsity and scienter because there are no factual allegations establishing a strong inference

that, when reporting on the Spiros clinical trials and the anticipated filing of the NDA, the Defendants knew that the Spiros product had defects that would delay or prevent FDA approval, or knew that any such defects could not be corrected in a manner to allow for such approval. Defendants also challenge these allegations on the basis Plaintiffs fail to state with particularity the facts upon which their allegations are based.

 Plaintiffs do not contend the TAC is based on their personal knowledge. Accordingly, the TAC is plead on "information and belief." In the Ninth Circuit, a securities fraud complaint based on information and belief has to "state with particularity all facts on which [a] belief is formed," and in so doing, the plaintiff must reveal "the sources of her information." *Silicon Graphics*, 183 F.3d at 985 (citation and internal quotation marks omitted); *accord Daou*, 411 F.3d at 1015. When the source of a plaintiff's information are internal reports, the plaintiff must allege specifics regarding those reports: the sources of the plaintiff's information with respect to the reports, how the plaintiff learned of the reports, who drafted the reports, which officers received them, and the contents of those reports. *Silicon Graphics*, 183 F.3d at 985. If a plaintiff relies on the accounts of confidential witnesses, the complaint must describe such personal sources " 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.' " *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir.2004) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000)). An assessment of the reliability of witnesses " 'involves an evaluation, *inter alia*, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including

from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.' " *Daou*, 411 F.3d at 1015 (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29–30 (1st Cir.2002)).

As an initial matter, the TAC does not identify any confidential witnesses as the source of Plaintiffs' information regarding Dura's problems with Albuterol Spiros and the purported fraudulent efforts to conceal those problems from the market. Instead, the TAC's allegations regarding Albuterol Spiros rely heavily on internal reports that purportedly documented all the problems with the inhaler's development. The TAC discusses with some detail the Eisele List that was prepared in October 1996 by Dura's Vice President of Product Development, and which included a list of problems with the Spiros drug delivery system and the Albuterol cassette. (TAC ¶¶ 9, 94, 121.) Problems identified in the Eisele List include the reliability of the Spiros device and stability of Albuterol. *Id.* ¶ 10. The pleading further alleges the Eisele List was distributed to senior management during the weekly executive management meeting held every Monday. *Id.* ¶¶ 9, 94, 121. Although Plaintiffs do not explain how they came to learn of the Eisele List, there are sufficient details regarding this report to indicate its reliability.

However, the TAC does not adequately describe the sources of Plaintiffs' information supporting the allegations regarding the on-going problems with the development of Albuterol Spiros and Defendants' knowledge of those problems. Plaintiffs allege Dura conducted in-house testing before Phase III clinical trials began, and that the testing showed problems with the drug's efficacy. *Id.* ¶¶ 11, 91. According to Plaintiffs, Defendants were kept apprised of the testing results "via chemical stability test results and analytical reports

that were circulated during weekly product development meetings" and in minutes generated from product development meetings. *Id.* ¶ 11. Absent from these allegations are any details regarding who generated the testing results and the minutes, or how Plaintiffs came to learn of these results. The timeline regarding these allegations is also only vaguely described as before Phase III clinical trials; it is not clear whether this in-house testing pre- or post-dated the Eisele List.

Similarly, the TAC's allegations regarding modifications to Albuterol Spiros during Phase III clinical trials require more specificity as to the sources of Plaintiffs' information. Plaintiffs contend that modifications to the inhaler "were well documented within the clinical trial results and reliability reports and each test run on each configuration was analyzed in a separate report." *Id.* ¶¶ 16, 93. Plaintiffs allege Senior Project Engineer Mike Ligotke and Project leader Linda Gieschen were responsible for drafting these reports. *Id.* ¶ 93. Plaintiffs do not allege who received these reports, when they were received, or how Plaintiffs came to learn of those reports.

Plaintiffs next allege that Defendants "were kept constantly informed of the problems affecting the inhaler's reliability via product reports prepared by Mike Ligotke, the Senior Product Engineer for the Spiros device and Linda Gieschen, the Spiros Project Leader." *Id.* ¶ 17. The TAC further alleges the reports were prepared for and circulated in advance of and during weekly research and development meetings. *Id.* However, absent are any allegations regarding when these reports were generated and distributed—whether it was during some or all of the Class Period, or whether these reports were generated prior to or after the Eisele List. Thus, it is not clear whether these are the same reports that documented modifications to the Spiros device during Phase III clinical trials. Further, there are no allegations regarding how the Plaintiffs came to learn of those reports.

Several of the TAC's allegations regarding Defendants' purported knowledge of problems plaguing Albuterol Spiros and fraudulent intent are not attributed to any source. For example, the TAC's allegations regarding internal dissent over whether to proceed with clinical trials or file the NDA are not supported by references to internal documents or confidential witnesses. Also absent is the source(s) of Plaintiffs' information regarding Dura's decision to retain Wyle to conduct HALT. Similarly, the TAC does not identify the source of Plaintiffs' allegations regarding the weekly executive management meetings conducted every Monday from 8:00 to 10:00 a.m. and Research and Development meetings. The absence of such allegations are significant because the crux of Defendants' malfeasance comes from their decision to forge ahead with clinical trials and the NDA submission notwithstanding their inability to remedy the problems identified in the Eisele List.

For these reasons, the TAC's allegations regarding Spiros must be dismissed. The Court, however, will allow Plaintiffs leave to amend the complaint so they can describe the sources of their information in accordance with *Silicon Graphics, Daou,* and *Nursing Home.* Because the Court finds the TAC does not adequately allege the sources of Plaintiffs' information, it declines to address Defendants' remaining challenges to these allegations at this time.

## II. *Ceclor CD*

### A. Allegations Regarding Ceclor CD

Plaintiffs contend that Defendants misrepresented and omitted critical informa-

tion regarding Dura's sales of Ceclor CD. Specifically, Plaintiffs allege that on April 15, 1997, Dura announced in a press release better-than-expected Q1 1997 results, stating that revenues for the quarter totaled $40.9 million, net income was $8.8 million, and EPS were $0.19—a 73% increase from $0.11 in first quarter 1996. (TAC ¶ 75.) In this release, Defendants boasted of doubled revenues overall and singled out Ceclor CD's purported sales success and trumpeted that Ceclor CD's "market share" of weekly new prescriptions of cefalcor had doubled from the end of 1996. *Id.* Dura's stock rose over 21% from $27.87 on April 14, 1997, to $34 on April 15, 2997 as a result of these announcements. *Id.* ¶ 76. Approximately two months later, Defendants delivered a similar message to the assembled investors and analysts at the William Blair Investment Conference. *Id.* ¶ 103.

On July 15, 1997, Dura reported better-than-expected Q2 1997 results in a press release, stating that net income for the second quarter totaled $9.3 million, or $0.20 per share on revenues of $43.6 million compared to net income of $4.6 million, or $0.12 per share, on revenues of $18.8 million in the second quarter that ended June 30, 1996. *Id.* ¶ 106. Dura's press release reported that Ceclor CD was well-received by physicians. *Id.*

On October 8, 1997, Dura representatives appeared at the UBS Life Science Conference. *Id.* ¶ 127. UBS thereafter reported that Dura presented compelling market share data regarding Ceclor CD's progress in the U.S. cefaclor cephalosporin franchise, and that Ceclor registered nearly a three-point sequential increase in market share between August and September. *Id.* Shortly after the conference, Dura announced better-than-expected 3Q 1997 results, reporting record earnings for both the third quarter and nine months year-to-

date of 1997, compared to the same period the previous year. *Id.* ¶ 131. The Company stated that net income for the third quarter totaled $11.3 million, or $0.24 per share, on revenues of $43.3 million compared to net income of $5.8 million, or $0.14 per share, on revenues of $25.9 million for the third quarter ended September 30, 1996. *Id.* Dura primarily attributed the increase in revenues to growth in sales of respiratory pharmaceuticals, which rose 91% to $36.1 million in the third quarter of 1997 compared to $18.9 million in the third quarter of 1996. *Id.* The pharmaceutical sales growth was largely due in part to the impact of new product acquisitions and introductions, such as Ceclor CD and Nasarel. *Id.* In a follow-up conference call, Vector reported Dura's management indicated that earnings for 1998 could run in the low $1.40's range. *Id.* ¶ 132.

On January 20, 1998, Dura reported better-than-expected Q4 1997 results, stating revenues were at $53.5 million and $181.3 million for the quarter and the full year, respectively. *Id.* ¶ 149. Excluding one-time charges, Dura would have had a net income of $18.0 million, or $0.37 per share in the quarter, and $47.4 million, or $0.99 per share for the year, compared to a net income of $9.9 million, or $0.22 per share for the fourth quarter of 1996 and $24.3 million, or $0.60 per share for the full year 1996. *Id.* Dura also reported that its sales from pharmaceuticals rose 89% to $150.5 million in 1997 compared to $79.6 million in 1996, due in part to product acquisitions. *Id.* In a press release, Garner was quoted as stating that the Company's Ceclor CD market share of the oral solid cefaclor market rose from 8% at the beginning of 1997 to 25% by year-end. *Id.*

Plaintiffs maintain these representations were false when made because sales of Ceclor CD were dropping throughout the Class Period. *Id.* ¶¶ 77(a), 134(a), 150.

Plaintiffs attribute the lower sales to the antibiotic's decreased use as more powerful antibiotics with fewer significant side effects developed, the fact the drug was not covered by most managed-care insurance, and problems with Dura's sales force. *Id.* ¶¶ 30–33. Actual sales of Ceclor CD fell from 47,288 units in March 1997 (the month before the start of the Class Period) to 39,808 in May 1997 (a month into the Class Period), and then fell to 24,797 units in July 1997. *Id.* ¶¶ 31, 87. According to Plaintiffs, Dura was artificially inflating its revenues and EPS by shipping excessive amounts of Ceclor CD and other products to wholesalers, who were enticed to take the product by price discounts, extended payment terms and/or other incentives. *Id.* ¶¶ 34–43, 77(b), 134(b), 150. Dura's sales representatives conducted "load-ins" and "fire sales" and were instructed to "load wholesalers to the max" with Ceclor CD, pressuring them to sell even more Ceclor CD near each quarter's end. *Id.* ¶¶ 41, 77(b), 78–82, 134(b), 150.

## B. Adequacy of The TAC's Allegations

As with the TAC's allegations regarding Albuterol Spiros, Defendants contend the pleading's averments regarding Ceclor CD fail to state a claim because Plaintiffs have not adequately pleaded the sources of their information or falsity and scienter with sufficient particularity. Defendants also argue that many of the alleged statements about Ceclor CD were non-actionable statements of general optimism puffery and cannot form the basis of a securities claim. Defendants further contend they cannot be held liable for statements made by third-party analysts.

### 1. Falsity and Scienter

Defendants maintain Plaintiffs have not adequately alleged falsity and scienter regarding Ceclor CD sales because the majority of Defendants' statements concern the growth in sales of multiple Company respiratory pharmaceuticals, and are not confined to sales of Ceclor CD. In addition, to the extent internal Company projections allegedly predicted flat or declining sales, the Company was not obligated to disclose such projections nor was such information inconsistent with statements by the Company about Ceclor CD. Defendants further contend the allegations regarding Ceclor CD sales reports address only three time periods—March 1997, May 1997, and July 1997—only two of which are in the Class Period, and there are no "specific numbers" or "percentages of decline" for the balance of the Class Period after July 1997. According to Defendants, Plaintiffs improperly attempt to plead "fraud by hindsight" by republishing Dura's press releases and analysts' reports and repeating the same "true facts" that Defendants supposedly "knew," without any evidentiary facts showing why that is so. Defendants maintain Plaintiffs fail to identify any contemporaneous materials that contradict any of Defendants' public statements. Instead, they plead boilerplate references to "sales reports" and other internal information. Defendants argue Plaintiffs' confidential witnesses do not provide sufficient corroborative details to establish reliability. The Court disagrees, and finds the TAC adequately alleges Defendants' knowledge of Ceclor CD's decreasing sales and their efforts to inflate sales and earnings through "fire sales" and "load-ins."

When analyzing the Second Consolidated Amended Complaint, the Ninth Circuit held that the existence of reports showing Ceclor CD sales "were below internal projections and Dura's knowledge of these

reports, coupled with Dura's statements that it was pleased with sales figures, are not specific facts that strongly suggest actual intent by Dura to mislead investors." *Dura*, 339 F.3d at 940. The appellate court stated that "Dura's internal expectations could have been aggressive and falling short of them may have been anticipated." *Id.* In addition, the Ninth Circuit stated that channel stuffing "may have some probative value insofar as the channel stuffing was done so as to artificially inflate income, but there may also be other legitimate reasons for attempting to achieve sales earlier." *Id.* The appellate court also found the complaint's allegations regarding insider trading were insufficient to establish scienter. *Id.*

Having carefully reviewed the TAC, the Court finds this pleading addresses the deficiencies in the Second Consolidated Amended Complaint identified by the Ninth Circuit. The TAC's allegations regarding declining Ceclor CD sales and Defendants' alleged efforts to inflate sales through "load-ins" and "fire sales" are sufficiently corroborated by internal reports and accounts from confidential witnesses. Although channel stuffing allegations alone may be insufficient to establish scienter, when viewed as a whole, as this Court must, the TAC adequately pleads a scheme by the Defendants to artificially inflate EPS growth by shipping excess amounts of product to wholesalers on the final few days of fiscal quarters.

The TAC alleges monthly sales reports were prepared by Dura's Information Technology Department from information obtained from IMS, a service that tracks prescription drug sales. (TAC ¶ 111.) The report compared actual versus planned sales of Dura's drug products, and were prepared for and disseminated by Defendant Spath and kept Defendants apprised of Dura's drug sales so they knew that such sales were below plan and insufficient for Dura to achieve continued EPS growth.[3] *Id.* Plaintiffs do not allege how they obtained the information from the monthly reports. However, other allegations of the TAC corroborate Plaintiffs' theory that Defendants misrepresented the sales of Ceclor CD for purposes of increasing Dura's stock price.

In particular, the TAC alleges the participants in the "fire sale" or "load-in" scheme: Newman, Garner, Spath, Doug Weiherer (Director of National Accounts), and Jack Strathmeyer (National Account Manager). (TAC ¶¶ 35, 37, 40, 43, 79, 150.) The TAC further alleges details of the scheme. In each quarter in 1997, about two or three weeks before a quarter's end when it became apparent that the Company's revenues were going to fall short of estimates, Dura's national accounts managers flew into San Diego to attend a sales meeting led by Defendant

---

**3.** Defendants contend the decline in Ceclor CD sales was due to seasonal fluctuations in sales of its respiratory pharmaceuticals. In support for this statement, Defendants rely on Dura's 1996 Annual Report filed on April 16, 1997, and request take judicial notice of that document under Federal Rule of Evidence 201. Plaintiffs oppose the request. The Court agrees with Plaintiffs that it is improper to take judicial notice of a document for the purpose of proving the truth of the document's statements. *See Troy Group, Inc. v. Tilson*, 364 F.Supp.2d 1149, 1152 (C.D.Cal.

2005) ("SEC filings should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents.") (internal quotations omitted). Accordingly, the Court declines to take judicial notice of the 1996 Annual Report as evidence the Defendants did not commit a securities violation.

Plaintiffs do not oppose Defendants' request the Court take judicial notice of other SEC filings. Insofar as the Court has relied on those documents, Defendants' request is GRANTED.

Spath and Weiherer aimed at strategizing on deals and terms that they could offer their respective third-party distributors as incentives to get them to take on large quantities of Ceclor CD. *Id.* ¶¶ 35, 78. National accounts managers dreaded the meetings because when they occurred, they knew they would be directed to participate in what was referred to as "load-ins." *Id.* At these meetings, Defendant Spath first made some general statements indicating that he needed the sales reps to generate more revenue before the end of the quarter so Dura would meet its quarterly projections. *Id.* Spath then left the meeting, and Weiherer got into the details of how much in revenues the sales managers needed to generate in order for the Company to meet the quarterly projections. *Id.* Weiherer then outlined specific discounts, payment extensions, and rights of return that they should offer their respective customer accounts as incentives to accept large orders of Ceclor CD. *Id.* They referred to this practice at Dura as "loading it in," a "load-in" or a "fire sale." *Id.*

The terms that were typically offered were a 6% or 12% discount on the price depending on the volume of the order (higher volume orders received the higher percentage discount), payment terms of 60, 90, or 120 days rather than the standard 30–day term, and would allow for returns anywhere from three months to three years after shipment for full or half credit on the purchase price. *Id.* ¶¶ 36, 41, 77(b), 79, 107(b), 134, 151. Dura would experience 75% returns of product sold subject to the load-ins, but still booked 100% of the revenues in the quarter the deal was struck, and did not set aside any of the revenues as a reserve for returns. *Id.* ¶¶ 39, 82. The significant returns impacted the national account managers' quarterly sales bonuses. *Id.*

According to Plaintiffs, Weiherer, Spath, and other upper management would travel to meet with customer representatives at McKesson, Cardinal, Bergen Brunswig, and Bindley Western even though these accounts technically were assigned to the national account managers. *Id.* ¶ 37, 80, 151. These customers constituted up to 60% of Dura's sales. *Id.* ¶ 41. A former national account manager recalls that "for a VP to call on a specific accounts was unheard of in this industry" at the time, and it was well-known at Dura that Weiherer's involvement meant that the Company was seeking to place a large "load-in" order of Ceclor CD with these customers. *Id.* ¶ 80.

The Plaintiffs rely on confidential witnesses for these allegations; in particular, a former national accounts manager and a former Dura Regional Sales Director. Defendants contend these descriptions are insufficient to meet the Ninth Circuit's particularity requirements regarding confidential sources, and points to this Court's decision in *Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F.Supp.2d 1203 (S.D.Cal. 2005). In *Adecco,* this Court found the bald allegation that a "former executive" provided information to be deficient. *Adecco,* 371 F.Supp.2d at 1211. There were no facts pled in the complaint regarding the witness's duties, when the executive worked at the company, or how the executive would have come to learn of the facts attributed to him or her. *See id.*

Having reviewed the TAC, the Court agrees with Defendants that the former Dura Regional Sales Director is not adequately described. In *Daou,* for example, the Ninth Circuit found the complaint met the PSLRA's requirement for confidential witnesses because those witnesses were described with great specificity: plaintiffs numbered each witness and described his or her job description and responsibilities.

*Daou,* 411 F.3d at 1016. In contrast, here, there are no allegations regarding the job duties of the former Regional Sales Director or how that individual was privy to the information attributed to him or her. For example, the TAC alleges the former Regional Sales Director "confirmed that Dura management, including Garner and additional defendants, met at the end of November or early December 1997 to discuss the fact that Dura was not going to make its 4Q 1997 numbers," and that the Defendants discussed "fire sales." (TAC ¶¶ 152, 154.) But there are no allegations as to how the Regional Sales Director would have come to learn of this information.

However, the TAC does provide sufficient information regarding the former national accounts manager to support the probability that individual would possess the information alleged. In particular, the national accounts manager was responsible for wholesalers and managed care providers. *Id.* ¶ 150. That witness came to learn of the information attributed to him or her because of that witness's participation in the quarterly sales meetings and the subsequent "load-ins" or "fire sales." *See id.* ¶¶ 35, 37, 78, 80, 150. The witness would also have information regarding how much Ceclor CD was returned as it would affect that individual's bonus. *See id.* ¶¶ 39, 82.

Not only does the TAC contain more detailed allegations regarding Defendants' purported scheme to ship excess Ceclor CD, but it also includes allegations that the Ninth Circuit specifically found "are the type that could demonstrate a strong inference that Dura knowingly or with deliberate recklessness made false or misleading statements to investors." *Dura,* 339 F.3d at 941. These allegations are

that Garner and Newman talked openly and frequently in public areas at Dura about their plan to maximize the stock price so that they could "take the cash and run." (TAC ¶ 171.) The TAC also alleges these Defendants openly discussed how they could make Dura appear more successful than it actually was. *Id.* When employees questioned Newman about these tactics, he replied, "let 'em catch us." *Id.* According to Plaintiffs, Newman repeated this catch phrase so often it became part of the Company vernacular. *Id.*

Notably, these allegations are properly supported by a confidential witness. The TAC attributes these averments to a former finance department employee who worked closely with Garner and Newman. *Id.* Garner also told this witness even before the Class Period began that he did not intend to stay at Dura for more than a couple of years, when he expected to cash out and do other things. *Id.*

In sum, the Court finds the TAC's allegations regarding Ceclor CD adequately plead falsity and scienter regarding Dura's Ceclor CD sales.

### 2. Which Defendants Are Liable

As discussed above, the TAC adequately alleges Defendants Newman, Garner, and Spath[4] were involved in the scheme to overload wholesalers with Ceclor CD to increase Dura's EPS, and that they acted with the requisite scienter. However, there are no allegations implicating Defendants Prettyman, Woodbury, Brown, or Cook. Instead, it appears the TAC attempts to impute liability to these Defendants based on the group pleading doctrine, stock sales, their positions in the Company, and motive. The Court does

4. Messrs. Weiherer and Strathmeyer also participated in the alleged scheme to overload wholesalers with Ceclor CD; however, they are not Defendants in this action.

not find these allegations sufficient to impose liability as to those Defendants.

### a. Group Pleading

The group pleading doctrine allows a presumption that false and misleading information disseminated through documents were made by the collective action of the corporation's officers. *In re Glen-Fed, Inc.,* 60 F.3d 591, 593 (9th Cir.1995); *In re Syncor Int'l Corp. Sec. Litig.,* 327 F.Supp.2d 1149, 1171 (C.D.Cal.2004). The Ninth Circuit has not opined whether this doctrine remains viable after the enactment of the PSLRA. However, this Court has joined other courts in this district and concluded the group pleading doctrine did not survive the PSLRA. *Adecco,* 371 F.Supp.2d at 1220–21. Other circuits have similarly concluded that the group pleading doctrine conflicts with the PSLRA's scienter requirement. *See, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 602–03 (7th Cir.2006); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 364–65 (5th Cir.2004). Accordingly, the Court finds the group pleading doctrine is not a basis to impute liability for the Company's statements regarding Ceclor CD as to Defendants Prettyman, Woodbury, Brown, or Cook.

### b. Stock Sales

Stock sales by Prettyman, Woodbury, Brown, and Cook are also an insufficient basis upon which to impute liability as to these Defendants. Unusual or suspicious stock sales can serve as circumstantial evidence of scienter. *Ronconi,* 253 F.3d at 434; *Silicon Graphics,* 183 F.3d at 986. "But not every sale of stock by a corporate insider shows that the share price is about to decline." *Ronconi,* 253 F.3d at 435. Accordingly, "courts have repeatedly held that the mere existence of stock sales does not raise a strong

inference of fraudulent intent. [citation] Plaintiffs have the burden at the pleading stage of explaining why the stock sales were unusual or suspicious." *In re PetSmart, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 1000 (D.Ariz.1999); *Ronconi,* 253 F.3d at 435; *Silicon Graphics,* 183 F.3d at 987. To meet this burden, the plaintiffs must show the trading was in amounts "dramatically out of line with prior trading practices, *at times calculated to maximize the personal benefit from undisclosed inside information.*" *Ronconi,* 253 F.3d at 435 (internal quotations omitted). The Ninth Circuit has identified three relevant factors when analyzing insider sales: " '(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.' " *Id.* (quoting *Silicon Graphics,* 183 F.3d at 986).

The Ninth Circuit agreed with this Court's finding that the Second Consolidated Amended Complaint did not properly allege Defendants' trading practices during the Class Period were dramatically out of line with their prior trading activities. *Dura,* 339 F.3d at 940. The TAC's allegations regarding these Defendants' stock sales again fail to plead the Defendants' stock sales during the Class Period were dramatically out of line with their prior trading practices, or that those sales were done at a time maximize profits. They are therefore insufficient to impute scienter as to Defendants Prettyman, Woodbury, Brown, and Cook.

### c. Motive

The TAC alleges Defendants set out to drive Dura's stock higher during 1997 because Defendants were completing a major debt offering for Dura to obtain working capital, and because Dura would have to exercise its option to repurchase

Spiros I and finance a new follow-on Spiros Development Corp. II entity to continue to pay for the ongoing development of Albuterol Spiros. (TAC ¶¶ 6, 19, 168.) The Court does not find these allegations sufficient to impute scienter as to Prettyman, Woodbury, Brown, and Cook vis-à-vis the Ceclor CD averments. In the absence of any allegations inculpating them in the "fire sale" and "load-in" scheme, Dura's need to obtain capital is a generic business motive courts have found insufficient to base the requisite mental intent. *See, e.g., Lipton,* 284 F.3d at 1038 ("If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.' ") (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995)); *PetSmart,* 61 F.Supp.2d at 999 ("A desire to present a sound financial profile cannot be viewed, alone, as circumstantial evidence giving rise to a strong inference of scienter.").

### d. Positions In the Company

Plaintiffs also seek to impute scienter on Defendants Prettyman, Woodbury, and Brown based on their positions in the Company, arguing they ran Dura as "hands-on" managers and as a result of their executive positions were aware of adverse non-public information. (*See, e.g.,* TAC ¶¶ 83–85, 108–10, 135–37.) This Court has held that "a complaint does not adequately plead scienter by claiming that key officers knew the true facts by virtue of their 'hands-on' positions and involvement in the day-to-day management of the company." *In re Peerless Systems Corp. Sec. Litig.,* 182 F.Supp.2d 982, 993 (S.D.Cal.2002); *accord Adecco,* 371 F.Supp.2d at 1217. The Ninth Circuit and district courts in this circuit have similarly

held that a defendant's position in the company does not, without more, create a strong inference of scienter. *See, e.g., In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1087 (9th Cir.2002); *In re Splash Tech. Holdings Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1080–81 (N.D.Cal.2001); *In re Autodesk, Inc. Sec. Litig.,* 132 F.Supp.2d 833, 843–44 (N.D.Cal.2000). "Rather than presume individual officer and director defendants must have known about a fraud by virtue of their positions within the defendant company, the persuasive force of each situation must be evaluated individually." *Adecco,* 371 F.Supp.2d at 1217 (internal quotations omitted). Given the absence of any allegations entangling Prettyman, Woodbury, and Brown in the scheme to load wholesalers with Ceclor CD, the Court finds the TAC's allegations regarding these Defendants' positions in the Company insufficient to impute scienter.

### e. Allegations in Totality

When reviewing whether a complaint properly states a securities fraud claim under the PSLRA, the court must consider " 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.' " *Daou,* 411 F.3d at 1022 (quoting *Nursing Home,* 380 F.3d at 1230); *Am. West,* 320 F.3d at 938. When "considering whether a strong inference of scienter has been pled, 'the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.' " *Daou,* 411 F.3d at 1022 (quoting *Gompper,* 298 F.3d at 897). Having reviewed the allegations in totality, the Court concludes the TAC fails to state a claim as to Defendants Prettyman, Woodbury, Brown, and Cook.

### 3. Puffery

 Defendants contend that many of the statements attributed to the Individual Defendants are mere "puffery" and optimistic statements about the future prospects of the Company that cannot form the basis of a securities claim. "The 'mere puffery' rule precludes liability for vague, generalized and unspecific assertions of corporate optimism." *In re Ligand Pharms., Inc. Sec. Litig.*, No. 04CV1620DMS(LSP), 2005 WL 2461151, at *19 (S.D.Cal. Sept. 27, 2005). " 'Statements that fall within the rule tend to use terms that are not measurable and not tethered to facts that a reasonable person would deem important to a securities investment decision." *Id.* (internal quotations omitted). This rule has its limitations; a projection of optimism becomes actionable "when (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Id.* (internal quotations omitted).

The statements regarding Ceclor CD are not subject to the puffery rule. As discussed above, Plaintiffs have adequately pleaded the Company's sales of Ceclor CD were artificially inflated through the "fire sales" and "load-ins" orchestrated by certain of the Defendants. Therefore, although statements that sales and demand for Ceclor CD were "strong," that the Company was "pleased" with Dura's performance and financial results, and that Ceclor CD was "well received" by physicians are generalized, the facts alleged in the TAC lead to a strong inference there was no reasonable basis for believing such statements to be true because the sales were achieved by overloading wholesalers with the product. Accordingly, the puf-

fery rule does not insulate Defendants from liability.

### 4. Safe Harbor and "Bespeaks Caution"

 Courts have refused to impose liability on statements which "bespeak caution." This doctrine "developed to address situations in which optimistic projections are coupled with cautionary language ... affecting the reasonableness of reliance on and the materiality of those projections." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir.1994). The PSLRA's safe harbor provision provides that forward-looking statements cannot be the basis for a securities fraud claim if: (1) the statement is identified as forward looking and is accompanied by sufficient cautionary statements; or (2) the person who made the forward-looking statement did so without actual knowledge that the statement was false or misleading. The safe harbor provision protects both written and oral forward-looking statements. *See* 15 U.S.C. § 78u–5(c)(1)–(2). The Ninth Circuit has held the PSLRA's safe harbor provision codified the judicially-created bespeaks caution doctrine. *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir.2004). Accordingly, it is appropriate to consider the application of the bespeaks caution doctrine and safe harbor provision simultaneously. *In re Copper Mountain Sec. Litig.*, 311 F.Supp.2d 857, 876 (N.D.Cal.2004).

 Under the safe harbor provision, a person is not liable for a "forward looking" statement provided the statement is identified as such, and is accompanied "by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in

the forward-looking statement."[5] 15 U.S.C. 78u–5(c)(1)(A)(i); *Am. W.*, 320 F.3d at 936. A "forward-looking statement" "is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *Am. W.*, 320 F.3d at 936.

Defendants contend that most of the challenged statements refer to Dura's future plans, objectives, and business prospects relating to the development and hoped-for FDA approval of the Spiros products, and its then newly-acquired Ceclor, Keftab, and Nasalide/Nasarel product lines. Defendants argue these statements are forward-looking and thus subject to the Reform Act's safe harbor provisions.

Defendants contend Dura disclosed the risks associated with its recent acquisition of Ceclor CD. For example, the Company's Form 10–Q filed on October 21, 1997 stated that "[f]ailure to successfully market and sell Keftab, Ceclor CD, Nasarel or Nasalide would have a material adverse effect on the Company's business, financial condition and results of operations." (Def.'s Req. for Jud. Not., Ex. Q at 13.) The Court finds neither the safe harbor nor the bespeaks caution doctrine insulate Defendants from liability for their statements regarding Ceclor CD.

The statements regarding Ceclor CD at issue in this case are not "forward looking." Plaintiffs allege Defendants misled investors about the current sales and demand for Ceclor CD, and that antibiotic's market share. (*See, e.g.,* TAC ¶ 75 (discussing Ceclor CD's market share of weekly new prescriptions); *id.* ¶ 106 (stating that Ceclor CD is well-received by physicians)). Accordingly, neither the safe har-

bor provision nor the bespeaks caution doctrine are applicable. *Cf. Am. W.*, 320 F.3d at 936–37 (finding statements disclosing a fine imposed and the present effects of the fine on the company not covered by the safe harbor provision). Further, even if these statements were subject to the safe harbor or bespeaks caution doctrine and were accompanied by sufficient cautionary statements, as discussed above, the TAC adequately alleges a strong inference they were made with actual knowledge of their falsity, precluding their protection by the safe harbor provision or bespeaks caution doctrine. *Cf. id,* at 937 n. 15 (stating that because there was a strong inference of actual knowledge, the statements were not protected by the safe harbor provision).

### 5. Statements Made by Third–Party Analysts

Many of the TAC's allegations attribute statements by analysts to the Defendants. Defendants argue they are not liable for those statements because Plaintiffs do not allege specific facts to support the conclusion they were "sufficiently entangled" with the analysts' forecasts. There are two types of liability related to statements made by analysts. *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1115 (D.Nev.1998). "First, a defendant may be directly liable for false statements made to analysts in the connection of a sale of a security." *Id.* Second, "a defendant may be liable for statements made by an analyst if the defendant, or a company or its officers or directors puts an express or implied imprimatur on the projections by endorsing or adopting them." *Id.* "A defendant 'adopts'

---

**5.** "There are additional requirements for oral forward-looking statements." *Am. W.,* 320 F.3d at 936 n. 14.

an analysts' report or forecast when he or she 'sufficiently entangled himself [or herself] with the analysts' forecasts.'" *Id.* (quoting *In re Caere Corp. Sec. Litig.* 837 F.Supp. 1054, 1059 (N.D.Cal.1993)). Plaintiffs respond that "entanglement" allegations are only required where defendants provided truthful information to analysts that was made misleading through modification by the analyst. They contend it is sufficient to have alleged the analysts' reports were based on and repeated information Defendants provided. The Court disagrees.

Plaintiffs may "forgo allegations of the defendants' adoption of the analysts' reports if the statements made to the securities analysts, which formed the basis of the report, were misleading and were made with the intent that they be communicated to the market." *Copperstone v. TCSI Corp.*, No. C 97–4395 SBA, 1999 WL 33295869, at *8 (N.D.Cal. Jan. 19, 1999). However, Plaintiffs' allegations must conform to the PSLRA's pleading requirements. *Id.* Plaintiffs must therefore "specify each statement to an analyst alleged to have been misleading." *Id.* The TAC does not contain any allegations specifying the statements Defendants made to analysts. Thus, insofar as the TAC relies on statements in analysts' reports, it must be dismissed. *Cf. id.* (finding insufficient allegations that defendants made false and misleading statements to non-party securities analysts with the intent the analysts would relay the information to the market); *Stratosphere*, 1 F.Supp.2d at 1105 (finding complaint deficient because it did not allege the time, place, and content of defendants' statements to the analysts).

### SUFFICIENCY OF THE ALLEGATIONS OF A § 20(a) VIOLATION.

The TAC alleges a claim under § 20(a) of the 1934 Securities and Exchange Act against Defendants Newman, Garner, and Spath. Section 20(a) provides for controlling person liability for every person who, directly or indirectly, controls any person liable under any of the provisions of this title. 15 U.S.C. § 78t(a). To establish control person liability, a plaintiff must show that a primary violation occurred, and that the defendant exercised actual power or control over the primary violator. *Am. W.*, 320 F.3d at 945. Defendants argue that because Plaintiffs fail to state a claim under § 10(b) and Rule 10b–5, the § 20(a) claim must be dismissed as well. *Heliotrope General, Inc. v. Ford Motor, Co.*, 189 F.3d 971, 978 (9th Cir. 1999).

The Court agrees that insofar as the § 20(a) claim relies on the Defendants' misrepresentations regarding Albuterol Spiros' development, the claim must be dismissed because the allegations regarding Spiros have not been pleaded in accordance with the PSLRA. However, the Court has found the TAC properly states a violation of § 10(b) and Rule 10b–5 against Garner, Spath, and Newman for misrepresentations regarding sales and demand of Ceclor CD. Accordingly, Defendants' motion to dismiss the § 20(a) claim as to Garner, Spath, and Newman is denied insofar as it challenges the TAC's allegations regarding sales and demand for Ceclor CD.

### CONCLUSION

Having considered the parties' briefs, the record, oral argument, applicable law, and good cause appearing, **IT IS HEREBY ORDERED:**

1. Defendants' motion to dismiss is **GRANTED IN PART AND DENIED IN PART** [dock. no. 119]. The Court finds the TAC sufficiently states a claim under § 10(b) and Rule 10b–5, and § 20(a) against Defendants Dura, Garner, New-

man, and Spath for their representations and omissions regarding Ceclor CD. However, the TAC's allegations based on statements by analysts regarding Ceclor CD, and the statements regarding Albuterol Spiros are deficient and therefore **DISMISSED WITH LEAVE TO AMEND.**

2. Within 30 days of the date this order is stamped "Filed," Plaintiffs may file an amended complaint that addresses the deficiencies in pleading discussed above. If Plaintiffs do not file an amended complaint in the time provided, the TAC shall proceed against Defendants Dura, Garner, Newman, and Spath only and as to *those Defendants'* (not analysts') representations and omissions regarding Ceclor CD. Should Plaintiffs choose to proceed only on those claims, Defendants shall file an Answer to the TAC within 45 days of the date this order is stamped "Filed."

3. Defendants' request for judicial notice is **GRANTED** insofar as the Court has relied on those documents.

**IT IS SO ORDERED.**